IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| FRANCHESCA FORD, individually, and on behalf of other members of the general public similarly situated,<br><br>    Plaintiff,<br><br>  v.<br><br>CEC ENTERTAINMENT, INC., a Kansas corporation; and DOES 1 through 10, inclusive,<br><br>    Defendants. | No. CV 14-01420 RS<br><br>**ORDER DENYING MOTION TO REMAND** |

## I. INTRODUCTION

Plaintiff Franchesca Ford filed this putative class action in state court, alleging Defendant CEC Entertainment, Inc. ("CEC") violated various California wage-and-hour laws. CEC removed the case, invoking jurisdiction under the Class Action Fairness Act ("CAFA"). Ford seeks to remand, contending CAFA's $5 million amount in controversy requirement has not been satisfied. Because CEC has adequately demonstrated the amount in controversy exceeds $5 million, the motion is denied.

## II. BACKGROUND

CEC, a corporation doing business as "Chuck E. Cheese's," operates food and entertainment restaurants throughout California. Ford worked as a non-exempt, hourly-paid employee at one of CEC's California restaurants. Ford asserts claims on behalf of herself and all non-exempt, hourly-

1 paid employees working at California CEC restaurants at any time within the four-year statute of
2 limitations through the date of certification. Ford asserts claims for: (1) unpaid overtime; (2) unpaid
3 minimum wages; (3) unpaid meal periods; (4) unpaid rest periods; (5) inaccurate wage statements;
4 (6) failure to pay wages due upon termination; (7) failure to pay wages due during employment; (8)
5 violation of Labor Code §§ 2698 *et seq.* ("PAGA"); and (9) violation of Business & Professions
6 Code §§ 17200, *et seq.* Ford's complaint does not specify the putative class size, amount in
7 controversy, or rate of violation.

8     In its notice of removal (NOR), CEC argued this case satisfies each of CAFA's provisions,
9 including the $5 million amount in controversy requirement. *See* 28 U.S.C. § 1332(d). CEC
10 estimated $10,609,400 in damages, basing its calculation on three of the claims: waiting time
11 violations, meal break violations, and rest break violations.

12     Ford contends CEC's calculations rest upon unsubstantiated, speculative assumptions
13 insufficient to establish that the amount in controversy exceeds $5 million. While CEC contends its
14 NOR adequately established the amount in controversy, it now offers additional summary data and
15 quantifies two new claims, resulting in a total estimated amount in controversy of $15,461,102.[1]

### III. LEGAL STANDARD

17     A defendant may remove a civil action from state court to federal court if original
18 jurisdiction would have existed at the time the complaint was filed. *See* 28 U.S.C. § 1441(a). The
19 Class Action Fairness Act of 2005 vests federal district courts with original jurisdiction to hear class
20 action cases where: (1) the amount in controversy exceeds $5 million; (2) there is minimal diversity,
21 where at least one plaintiff is diverse from one defendant; and (3) the monetary claims of 100 or
22 more plaintiffs are proposed to be tried jointly on the grounds that the plaintiffs' claims involve
23 common questions of law or fact. *See id.* § 1332(d).

---

[1] CEC provides estimates for individual claims, as well as alternate estimates based on different violation rates. The $15,461,102 total provided here combines CEC's most conservative estimates: $6,569,310 (waiting time penalties, 100% violation rate) + $2,020,235 (meal period penalties, 18% violation rate) + $2,810,847 (rest break penalties, 19% violation rate) + $1,353,570 (inaccurate wage statement penalties, 20% violation rate) + $2,707,140 (PAGA penalties, 20% violation rate) = $15,461,102.

"[R]emoval statutes are strictly construed against removal." *Luther v. Countrywide Homes Loans Servicing LP*, 533 F.3d 1031, 1034 (9th Cir. 2008). "Federal jurisdiction must be rejected if there is any doubt as to the right of removal in the first instance," such that courts must resolve all doubts as to removability in favor of remand. *See Gaus v. Miles, Inc.*, 980 F.2d 564, 566 (9th Cir. 1992). The party seeking removal bears the burden of establishing that federal jurisdiction exists. *See id.*

## IV. DISCUSSION

The parties do not dispute Ford's class contains more than 100 members, or that the parties are minimally diverse as required by § 1332(d). Ford argues, however, that CEC fails to establish the amount in controversy exceeds $5 million, as required by CAFA.

When the plaintiff does not specify the amount of damages in the complaint, "the removing defendant must prove by a preponderance of the evidence that the amount in controversy requirement has been met." *Abrego Abrego v. The Dow Chem. Co.*, 443 F.3d 676, 683 (9th Cir. 2006) (per curiam). Since Ford does not plead a specific amount of damages, CEC must demonstrate it is "more likely than not" that the amount in controversy exceeds $5 million. *See Sanchez v. Monumental Life Ins. Co.,* 102 F.3d 398, 404 (9th Cir. 1996).

When measuring the amount in controversy a court must assume the allegations in the complaint are true, and that a jury will return a verdict for the plaintiff on all claims. *Kenneth Rothschild Trust v. Morgan Stanley Dean Witter*, 199 F. Supp. 2d 993, 1001 (C.D. Cal. 2002). "The ultimate inquiry is what amount is put 'in controversy' by the plaintiff's complaint, not what a defendant will *actually* owe." *Korn v. Polo Ralph Lauren Corp.*, 536 F. Supp. 2d 1199, 1205 (E.D. Cal. 2008) (emphasis in original).

To meet its burden, CEC is not required to "research, state, and prove the plaintiff's claims for damages." *See Coleman v. Estes Express Lines, Inc.*, 730 F. Supp. 2d 1141, 1148 (C.D. Cal. 2010) (citations and quotations omitted). Nevertheless, a court "cannot base [a finding of] jurisdiction on [d]efendant's speculation and conjecture.'" *Lowdermilk v. U.S. Bank Nat'l Ass'n*, 479 F.3d 994, 1002 (9th Cir. 2007), *overruled on other grounds*, *Rodriguez v. AT & T Mobility Servs. LLC*, 728 F.3d 975, 977 (9th Cir. 2013). "Rather, a defendant must set forth the underlying facts

supporting its assertion that the amount in controversy exceeds the statutory minimum." *Korn*, 536 F. Supp. 2d at 1205 (citing *Gaus v. Miles, Inc.*, 980 F.2d 564, 567 (9th Cir. 1992)).

A. Waiting Penalties Claim

*i. First Estimate*

CEC's NOR calculations relied on some assumptions that were viable, and others that were not. In its NOR, CEC calculated waiting time penalties of approximately $5,950,368. Under California Labor Code § 203, when an employer willfully denies wages owed to a former employee, the former employee may recover penalties in the amount of her daily pay rate for every day the wages are late, for up to a period of to 30 days.[2] Ford alleges CEC failed to pay wages due upon separation, including "overtime wages, minimum wages, and meal and rest period premium wages[.]" (Compl. ¶ 85). To calculate waiting time penalties, CEC utilized former employees' minimum hourly wage, and relied on information from Lindsey Thomas' declaration, including the number of former part-time and full-time employees, and general shift lengths.[3]

CEC assumed a 100% waiting time violation rate, and presumed employees are entitled to the maximum 30 days of waiting time penalties. Ford argues that assuming a 100% violation rate is unwarranted. Federal district courts in California have disagreed over whether defendants may assume certain variables for purposes of estimating the amount in controversy in wage-and-hour class actions. *See Altamirano v. Shaw Industries, Inc.*, C-13-0939 EMC, 2013 WL 2950600, at *5-7 (N.D. Cal. June 14, 2013) (reviewing how federal district courts in California have addressed this issue). Nevertheless, removing parties have been permitted to base their calculations on a 100% violation rate when such assumptions are "supported directly by, or reasonably inferred from, the allegations in the complaint." *Id.* at *7; *see e.g. Fong v. Regis Corp.*, C 13-04497 RS, 2014 WL 26996, at *6 (N.D. Cal. Jan. 2, 2014) ("Considering the broad allegations in the complaint,

---

[2] Employers in California must pay all wages owed within 72 hours of when an employee resigns, and immediately if an employee is discharged or laid off. Cal. Lab. Code §§ 201-202.

[3] Part-time employees: $8.00 per hour (minimum hourly wage) × 5 hours per day (shift length) × 30 days (maximum penalty period) × 4,461 (former part-time employees) = $5,353,200;
Full-time employees: $8.00 per hour (minimum hourly wage) × 8.7 hours per day (shift length) × 30 days (maximum penalty period) × 286 (former part-time employees) = $597,168;
Total: $5,950,368 ($5,353,200 + $597,168).

[defendant's] estimate [was] persuasive"). These courts reason that plaintiffs could avoid removal by limiting the allegations in the complaint, and that "imposing overly stringent requirements on defendants to proving the amount in controversy would run the risk of essentially asking defendants to prove the plaintiffs' case." *See Altamirano*, 2013 WL 2950600 at *5 (citing *Muniz v. Pilot Travel Ctrs LLC*, CIV. S-07-0325FCDEFB, 2007 WL 1302504, at *4 (E.D. Cal. May 1, 2007).

Here, Ford's broad allegations adequately support CEC's assumption of a 100% violation rate. Ford alleges "Defendants *regularly* required Plaintiff and class members to work off-the-clock while waiting for supervisors to count their cash drawers"; "Defendants also had a *policy and/or practice* of not paying meal period premiums"; and "Defendants implemented a *systematic, company-wide policy* to not pay rest period premiums." (Compl. ¶ 56, 67, 74) (emphasis added). Ford does not narrow the scope of her complaint. Rather, Ford claims CEC denied all class members some compensation, thereby entitling every class member to waiting time penalties. Assuming a 100% violation rate is thus reasonably grounded in the complaint.

Ford also argues that because she only alleges "up to" the 30-day maximum, CEC unreasonably assumes class members may be entitled to penalties for all 30 days. (*See* Compl. ¶ 89). Alleging "up to" 30 days, however, does not preclude CEC from assuming the statutory maximum. *See Altamirano*, 2013 WL 2950600 at *12 (permitting defendants to assume penalties for the entire 30-day period when "there [was] nothing in the complaint or the record to suggest [d]efendants paid employees these unpaid wages at some point"). Because no averment in the complaint supports an inference that these sums were ever paid, Ford cannot now claim class members may be awarded less than the statutory maximum. *See id.*

While assuming a 100% violation rate is appropriate, CEC's calculation of waiting time penalties rests on other assumptions not adequately grounded in summary data. The NOR estimate relies on the number of former employees, minimum hourly wage, and shift length. While the total number of employees and minimum hourly wage reflect valid summary data, CEC's assumptions regarding shift length lack an evidentiary basis. Thomas' declaration states "non-exempt part-time employees in California are *generally* scheduled for and work shifts of 5.0 hours." (Thomas Decl., ¶ 10) (emphasis added). It is unclear, however, how Thomas determined "general shift length." CEC

presumably had access to summary data regarding average shift length and number of shifts. The NOR thus fails to provide a reasonable estimate of Ford's § 203 waiting time penalties claim.

### *ii. Second Estimate*

While the NOR's estimated waiting time damages were unfounded, CEC submits an alternative estimate in its opposition to remand. "A court may properly consider evidence the removing party submits in its opposition to remand, even if this evidence was not submitted with the original removal petition." *Altamirano*, 2013 WL 2950600 at *3 (citing *Cohn v. Petsmart, Inc.*, 281 F.3d 837, 840 n. 1 (9th Cir. 2002)). Accordingly, the infirmities of CEC's removal petition do not necessarily preclude the conclusion that removal was proper.

CEC's opposition to remand estimates waiting time penalties of $6,569,310. This amount reflects the declaration of Brendan Rogers, an economic consultant who relies on the total number of former employees, average daily shift length, and average hourly pay rate.[4] Unlike the initial estimate, CEC's new calculation reflects valid summary data, including class members' individual time records and bi-weekly compensation records. Moreover, CEC's second estimate justifiably assumes a 100% violation rate, as previously discussed. The broad allegations in the complaint, coupled with Rogers' summary data, are sufficiently persuasive to credit the second estimate of waiting time damages. The $6,569,310 estimated waiting time penalties alone thus satisfies the requisite amount in controversy.[5]

### B. Meal Period and Rest Break Claims

### *i. First Estimate*

The initial calculations for meal and rest period claims also relied on assumptions of mixed quality. In its NOR, CEC estimated damages for meal period violations of $2,329,600 and rest break violations of $2,329,600, or a combined $4,659,200. Under California law, employees who are not provided a proper meal or rest period may recover one additional hour of pay at the employee's

---

[4] 4,675 (former employees) × $46.84 (average daily earnings, based on average daily shift length and the average hourly pay rate) × 30 (total days) = $6,569,310.

[5] CEC avers that even a 62% violation rate, plus 25% attorneys' fees, would put $5,092,093 into controversy.

regular hourly pay rate for each workday that the meal or rest period was not provided. Cal. Lab. Code § 226.7(c).

Ford alleges "class members were *frequently* not permitted to take timely meal periods, especially on weekends" and CEC "maintained a *uniform unlawful meal break policy*[.]" (Compl. ¶ 65-66) (emphasis added). Ford also claims "Plaintiff *frequently* had to work through her ten (10) minute rest periods" and CEC "implemented a *systematic, company-wide policy* to not pay rest period premiums." (Compl. ¶ 74) (emphasis added).

To calculate its NOR meal period claim of $2,329,600, CEC assumed employees working on weekends took late meal breaks at least 40 times per year, or a 38% violation rate on weekend days. CEC also assumed 1,820 non-exempt employees experienced these violations, since on Saturday, February 22, 2014, there was 1,820 non-exempt employees working in California CEC stores. Assuming the same 38% violation rate for rest period claims, CEC estimated an additional $2,329,600 in damages.[6]

Ford argues that because she does not allege a violation rate, assuming 40 meal and 40 rest break violations per year is arbitrary. Courts in this district, however, permit defendants to assume a violation rate for meal and rest period claims when the complaint does not specify one. *See e.g. Navarro v. Servisair, LLC*, C 08-02716 MHP, 2008 WL 3842984, at *9 (N.D. Cal. Aug. 14, 2008) (assuming three weekly meal period violations was reasonable where the plaintiff "[did] not limit his claim by stating that only a certain number of hours went uncompensated"); *Giannini v. Nw. Mut. Life Ins. Co.*, C 12-77 CW, 2012 WL 1535196, at *3 (N.D. Cal. Apr. 30, 2012) (finding the assumption of one missed meal and rest period per day was "not arbitrary or conjectural" given the complaint's broad allegations). Here, assuming a 38% violation rate on weekend days is reasonable in light of Ford's general averments.

The NOR estimate, however, rests on other unsubstantiated assumptions. First, CEC proffered no evidence showing the 1,820 class members employed on February 22, 2014 worked for the entire four-year period, and thus suffered 40 meal and 40 rest break violations. Second, CEC

---

[6] 1,820 employees × 40 late meal/rest periods × $8.00 per hour minimum wage × four year statute of limitations = $2,329,600.

provided no data demonstrating any of these employees worked shifts long enough to entitle them to meal periods. CEC's assumption that 1,820 employees are entitled to damages for meal and rest break violations is therefore without support.

### ii. Second Estimate

In its opposition to remand, CEC submits an alternative estimate for meal and rest period claims. Rogers' declaration, based on daily time records and bi-weekly compensation reports, states there were 218,877 shifts greater than five hours on Sundays, or 18% of all shifts over five hours. Rogers then multiplied this figure by $9.23, the average hourly pay rate of class members with shifts longer than five hours on Saturdays and/or Sundays. In total, CEC estimates the meal period claim to be $2,020,235. To calculate the $2,810,847 rest period claim, Rogers multiplied 301,593 shifts, or 19% of total shifts over 3.5 hours, by $9.32, the average hourly pay rate for class members who had shifts longer than 3.5 hours on Saturdays and/or Sundays. The new combined meal and rest period estimate totals $4,831,082.

CEC's revised estimate is based on summary data and has thus cured the NOR estimate's infirmities. Unlike the original estimate, which unreasonably relied on the number of employees working on a particular day, the second calculation is based on total shifts and accounts for varying shift length. Moreover, in light of the complaint's broad allegations, CEC reasonably assumes an 18% violation rate for meal break penalties and a 19% violation rate for rest break penalties. Adding the meal break claim alone to the waiting time claim thus pushes the amount in controversy to $8,589,545, well above the $5 million threshold.[7]

### C. Pay Period Penalty Claims

CEC quantifies two new claims in its revised calculation: inaccurate wage statement penalties and PAGA penalties. First, CEC estimates damages for inadequate wage statements under California Labor Code § 226(a), which requires employers to provide employees itemized wage

---

[7] Some courts have interpreted California Labor Code § 226.7(c) to entitle employees "to an additional hour's wages per day, even if denied both a rest and meal period during that day." *See Roth v. Comerica Bank*, 799 F. Supp. 2d 1107, 1120 (C.D. Cal. 2010). Here, employees may have experienced both meal and rest break violations on the same day. Since CEC can easily satisfy the amount in controversy without relying upon both claims, however, it is unnecessary to decide whether California law precludes removing defendants from including both claims.

1 statements displaying an accurate summary of hours worked and wages earned. When an employer
2 knowingly and intentionally fails to provide an accurate wage statement, an employee may recover
3 $50 for the initial pay period in which a violation occurred, and $100 for each violation in a
4 subsequent pay period, not to exceed $4000. *See* § 226(e)(1).

Here, Ford alleges "class members were not paid for all hours worked because all hours worked were not recorded." (Compl. ¶ 29). Ford also claims CEC "had a *policy and/or practice* of requiring Plaintiff and class members to clock-out and then wait for a supervisor to count their cash drawers before being cleared to leave," resulting in CEC's "failure to pay Plaintiff and class members the unpaid balance of overtime compensation . . . ." (Compl. ¶ 51-52) (emphasis added).

The complaint broadly alleges that CEC systematically violated § 226. Given the general averments, CEC reasonably assumes each wage statement given to each putative class member may have violated § 226. Based on Rogers' declaration that 4,201 class members worked 69,779 pay periods between January 27, 2013 and February 25, 2014, CEC finds a 20% violation rate would put $1,353,570 in controversy for the § 226 claim.[8] The summary data in Rogers' declaration is sufficient to support CEC's estimated wage statement claim.

Second, CEC calculates damages for violating California Labor Code §§ 2698, *et seq.* ("PAGA"), which provides that "[n]otwithstanding any other provision of law, a [p]laintiff may as a matter of right amend an existing complaint to add a cause of action arising under this part at any time within 60 days of the time periods specified in this part." PAGA penalties are $100 for each initial violation, and $200 for each subsequent violation. § 2699(f)(2). CEC uses the same summary data from the wage statement claim to find that PAGA penalties, at a 20% violation rate, amount to $2,707,140.[9]

---

[8] When a plaintiff shows actual damages flowing from the receipt of an inaccurate wage statement, the limitations period is two years. Absent actual damages, the limitations period is one year. Cal. Lab. Code § 226; Cal. Code Civ. Proc. § 340(a). Here, CEC relies on a statutory period slightly longer than one year. Since the amount in controversy is already well over the requisite amount, however, even excluding wage statement violations, this order need not address whether a two-year limitations period might ultimately apply.

[9] $13,535,700 (total PAGA penalties) × 0.2 (20%) = $2,707,140.

**United States District Court**
For the Northern District of California

#### D. Summary

Although CEC's initial estimates were overly speculative, its second estimates are grounded in reasonable assumptions based on the complaint's allegations and summary data. The waiting time, rest break, and wage statement claims alone, even before including the PAGA and meal break claims, put over $10 million in controversy.[10] Assuming the complaint's allegations to be true, as is required for purposes of determining the amount in controversy, there is no reasonable calculation that would yield a figure below $5 million. *See Kenneth*, 199 F. Supp. 2d at 1001. CEC's projections therefore demonstrate the amount in controversy is "more likely than not" in excess of $5 million. *See Sanchez,* 102 F.3d at 404.

That the amount in controversy necessarily exceeds the jurisdictional minimum is further supported by the four claims excluded from CEC's calculation, as well as attorney fees. Courts in this circuit have held that, for purposes of calculating the amount in controversy in wage-and-hour class actions, removing defendants can reasonably assume plaintiffs are entitled to attorney fees valued at approximately 25% of projected damages. *See, e.g., Staton v. Boeing Co.*, 327 F.3d 938, 968 (9th Cir. 2003) ("This circuit has established 25% of the common fund as a benchmark award for attorney fees") (citations and internal quotations omitted).

### V. CONCLUSION

Although CEC's notice of removal contained speculative and inadequate calculations, its second estimate, supported by Rogers' declaration and valid summary data, establishes by a preponderance of the evidence that the amount in controversy exceeds $5 million. Accordingly, the court has original jurisdiction pursuant to the Class Action Fairness Act of 2005. Ford's motion to remand is therefore DENIED.

IT IS SO ORDERED.

Dated: 7/10/14

_____
RICHARD SEEBORG
UNITED STATES DISTRICT JUDGE

---

[10] $6,569,310 (waiting time penalties) + $2,810,847 (meal period penalties) + $1,353,570 (inaccurate wage statement penalties) = $10,733,727.